McCONNELL, Circuit Judge,
joined by TACHA, Chief Judge, and PORFILIO, PAUL J. KELLY, JR., O’BRIEN, and HOLMES, Circuit Judges,
concurring in the judgment.
I share the majority’s ultimate conclusion that the district court correctly denied SUWA’s motion to intervene, but do not agree with its reasoning.
I. SUWA LACKS THE LEGAL INTEREST NECESSARY TO INTERVENE UNDER RULE 24(A)
The proposed intervenors unquestionably have the interest and expertise to contribute meaningfully to judicial deliberations in this case. The issue, though, is whether they have legal interests relating to the litigation such that they should be admitted as parties, and not merely as amici curiae. The principal difference between party and amicus status is that only parties ordinarily have the right to raise new issues, oppose settlements, appeal, and file petitions for certiorari. While am-ici have the right to make arguments, only parties can avail themselves of judicial power to compel action by other parties, either inside or outside the litigation.
In administrative, constitutional, and other public law litigation, we have become accustomed to wide-ranging interest-group participation and the distinction between amici and parties is somewhat blurred. This tradition of broadly inclusive public law litigation helps explain why this Circuit has taken a “liberal line” toward intervention, Utah Ass’n of Counties v. Clinton, 255 F.3d 1246, 1249 (10th Cir.2001) (internal quotation marks omitted), and is what makes the majority’s conclusion that SUWA has an “interest relating to” the subject of this litigation seem even remotely plausible.
But this is not ordinary public law litigation. This is a case about title to real property. Whatever may be the rules for intervention in proceedings about how national park land should be administered, it is hard to see how SUWA (or its off-road vehicle user counterparts, who are waiting in the wings to intervene on the same legal theory that supports SUWA’s intervention, see San Juan County’s Pet. for Reh’g En Banc 3) can be considered a party to the question of what real property the United States owns, or whether the United States granted an easement to San Juan County decades ago. SUWA may wish or hope that the United States owns unfettered title to this beautiful stretch of canyon country so that statutory protections will apply, and ATV users may wish or hope that San Juan County obtained a transportation right-of-way to enable them to travel through it, but neither interest group *1211 has a right — & legally protectable interest — one way or the other. As citizens and users, SUWA’s members have enforceable statutory rights regarding how the land is administered if the United States owns the land, but they have no legal rights regarding whether the United States owns the land. Indeed, the majority admits that this lawsuit “concernfs] only the relative rights of the County, the State, and the United States in Salt Creek Road.” Maj. Op. 1174. Logically, that should be the end of the matter. I therefore join Judge Kelly’s concurring opinion, to the extent it holds that SUWA lacks the legal interest necessary to intervene in a case involving solely the question of real property ownership.[1]
II. SOVEREIGN IMMUNITY BARS INTERVENTION BY A PARTY OUTSIDE THE TERMS OF THE QUIET TITLE ACT
The real answer to the problem in this case, however, lies outside Rule 24(a), in the Quiet Title Act, 28 U.S.C. § 2409a. Indeed, I worry that in our attempt to avoid cluttering this action with non-parties, we may inadvertently announce rules for 24(a) intervention that are too stringent for other contexts. Rather than apply general principles of intervention to this case as if it were ordinary public law litigation, we should — indeed, must — apply the specific principles applicable to lawsuits in which the title of the United States to real property is at issue. The Quiet Title Act is a limited waiver of sovereign immunity to permit suits against the United States only by parties claiming legal title to property also claimed by the United States. In contrast to Rule 24(a), which allows intervention by “anyone” who claims an interest “relating to” the property (and meets the other qualifications), the Quiet Title Act limits suits to parties who claim a right, title, or interest “in the real property,” 28 U.S.C. § 2409a(d). The narrower terms of the immunity waiver must take precedence over the broader terms of the Rule. I thus conclude that SUWA’s motion to intervene should have been denied on the ground that the district court lacks jurisdiction to expand the scope of a Quiet Title Act case to include parties other than those authorized by the Act.
A. Our Jurisdiction To Consider the Issue
The United States contends that its sovereign immunity prohibits SUWA’s intervention in this case. Federal Appellees’ Supp. Reply Br. on Rehearing En Banc 7-10. “When the United States consents to be sued, the terms of its waiver of sovereign immunity define the extent of the court’s jurisdiction.” United States v. Mottaz, 476 U.S. 884, 841, 106 S.Ct. 2224, 90 L.Ed.2d 841 (1986). Thus, even though the government raised this issue late in the litigation, it is not an argument that this Court may ignore or treat as waived. See Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 94-95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (“The requirement that jurisdiction be established as a threshold matter ‘spring[s] from the nature and limits of the judicial power of the United States’ and is ‘inflexible and without exception.’ ”) (quoting Mansfield, C. & L.M.Ry. *1212 Co. v. Swan, 111 U.S. 379, 382, 4 S.Ct. 510, 28 L.Ed. 462 (1884)); Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982) (“Subject matter jurisdiction ... is an Art. Ill ... requirement-[A] party does not waive the requirement by failing to challenge jurisdiction early in the proceedings.”). As this Court noted in Neighbors for Rational Development v. Norton, because the federal government’s sovereign immunity argument under the “Quiet Title Act ... involves subject matter jurisdiction, we begin there.” 379 F.3d 956, 960 (10th Cir.2004).
B. Merits of the Issue
The Supreme Court has long recognized that the United States enjoys immunity from suit unless Congress explicitly and unequivocally waives that immunity by statute. Lane v. Pena, 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996); Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 411-12, 5 L.Ed. 257 (1821). And even when the United States does waive its sovereign immunity, that waiver is to be “strictly construed, in terms of its scope, in favor of the sovereign.” Lane, 518 U.S. at 192, 116 S.Ct. 2092; see also Library of Congress v. Shaw, 478 U.S. 310, 318, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986) (“[W]e must construe waivers strictly in favor of the sovereign, and not enlarge the waiver beyond what the language requires.” (internal citations and quotation marks omitted)); United Tribe of Shawnee Indians v. United States, 253 F.3d 543, 547 (10th Cir.2001). In other words, we are to “con-stru[e] ambiguities in favor of immunity.” United States v. Williams, 514 U.S. 527, 531, 115 S.Ct. 1611, 131 L.Ed.2d 608 (1995). Consequently, where a statute can plausibly be read not to waive an aspect of the government’s immunity, the Court must adopt that reading. United States v. Nordic Village, Inc., 503 U.S. 30, 37, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992); see also U.S. Dep’t of Energy v. Ohio, 503 U.S. 607, 627, 112 S.Ct. 1627, 118 L.Ed.2d 255 (1992).
This does not mean that rules of procedure never apply in suits against the government unless they were expressly incorporated in the waiver statute. The Supreme Court has distinguished between what it calls “auxiliary” rules, which are ordinarily governed by the standard rules of procedure, and “substantive” or “jurisdictional” rules, which implicate sovereign immunity. In Henderson v. United States, 517 U.S. 654, 116 S.Ct. 1638, 134 L.Ed.2d 880 (1996), the Supreme Court considered whether the 120-day period for service of process set forth in Fed. R.Civ.P. 4(j)[2] applies to suits against the United States brought pursuant to the Suits in Admiralty Act, 46 U.S.C. § 741 et seq., which contains a provision stating that service shall be made “forthwith.” Id. § 742. The government contended that Rule 4’s 120-day period could not supersede the Suits in Admiralty Act’s “forthwith” requirement because that requirement “is ‘jurisdictional’ and affects ‘substantive rights’ by setting the terms on which the United States waives its sovereign immunity.” 517 U.S. at 664, 116 S.Ct. 1638. The Court rejected the government’s argument on the ground that “[sjervice of process, we have come to understand, is properly regarded as a matter discrete from a court’s jurisdiction to adjudicate a controversy of a particular kind, or against a particular individual or entity.” Id. at 671, 116 S.Ct. 1638. “Its essential purpose is auxiliary,” the Court explained, “a purpose distinct from the substantive matters aired in the preee- *1213 dent on which the dissent ... relies — who may sue, on what claims, for what relief, within what limitations period.” Id. (footnotes omitted). See also id. at 667-68, 116 S.Ct. 1688 (describing certain rules as having “a distinctly facilitative, ‘procedural’ cast” and explaining that “[t]hey deal with case processing, not substantive rights or consent to suit”).
On the other hand, as if to foreclose the very argument made by the majority in this case, the Court held that other matters, even though addressed by the Rules of Civil Procedure, lie at the “substantive” core of sovereign immunity and must be governed by the terms of the statutory waiver rather than by generally applicable provisions of the Rules of Civil Procedure. Id. at 671, 116 S.Ct. 1638. Significantly, those matters include “who may sue, on what claims, for what relief, within what limitations period.” Id. (footnotes omitted). It follows that rules such as Fed. R.Civ.P. 14 (impleader), 18 (joinder of claims), 19 (joinder of additional parties), 20 (permissive joinder of additional parties), 24 (intervention), and 65 (injunctions) cannot apply to suits against the government to the extent that they expand upon the parties, claims, or available relief specified in applicable immunity waiver statutes. Indeed, the Supreme Court has repeatedly held that where a litigation rule normally applicable to suits between private parties would touch upon one of these core jurisdictional areas, the rule does not apply. See, e.g., Library of Congress v. Shaw, 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986) (available relief); Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 120, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (claims).
In support of its conclusion that “who may- sue” forms part of the substantive core of sovereign immunity, the Henderson Court cited United States v. Sherwood, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). See 517 U.S. at 671 n. 21, 116 S.Ct. 1638. Sherwood concerned the relation between joinder of necessary parties under the Federal Rules of Civil Procedure and the Tucker Act’s waiver of sovereign immunity to permit suits against the United States “founded ... upon any contract, express or implied, with the Government of the United States.” Id. at 587, 61 S.Ct. 767 (internal quotation marks omitted). Sherwood, a judgment creditor, brought suit in federal district court against the United States for damages for breach of contract owed Kaiser, the judgment debtor. Id. at 586-87, 61 S.Ct. 767. Because the judgment debtor was a necessary party to such a suit, Sherwood included Kaiser as co-defendant, along with the United States, in the Tucker Act suit. Id. at 588, 61 S.Ct. 767. Henderson’s, citation of Sherwood demonstrates that the substantive question of “who may sue!’ is not confined to who may initiate suit, see Maj. Op. 1179, but includes who may be joined as a party to a suit brought by another.
The Second Circuit held that the Tucker Act gave the court jurisdiction to adjudicate Sherwood’s claim against the United States and the Federal Rules of Civil Procedure authorized the court to include Kaiser as co-defendant. Id. at 589, 61 S.Ct. 767. The Supreme Court reversed. It explained that the Second Circuit’s theory
presuppose[d] that the United States, either by the rules of practice or by the Tucker Act or both, has given its consent to be sued in litigations in which issues between the plaintiff and third persons are to be adjudicated. But we think that nothing in the new rules of civil practice so far as they may be applicable in suits brought in district courts under the Tucker Act authorizes the maintenance of any suit against the *1214 United States to which it has not otherwise consented.
An authority conferred upon a court to make rules of procedure for the exercise of its jurisdiction is not an authority to enlarge that jurisdiction and the Act ... authorizing this Court to prescribe rules of procedure in civil actions gave it no authority to modify, abridge or enlarge the substantive rights of litigants or to enlarge or diminish the jurisdiction of federal courts.
Id. at 589-90, 61 S.Ct. 767. Interpreting the Tucker Act “in the light of its function in giving consent of the Government to be sued,” id. at 590, 61 S.Ct. 767, and stressing that “[t]he matter is not one of procedure but of jurisdiction whose limits are marked by the Government’s consent to be sued,” id. at 591, 61 S.Ct. 767, the Court held that the Act “did no more than authorize the District Court to sit as a court of claims,” which is not authorized to hear suits between private parties, id. Accordingly, notwithstanding the Rule of Civil Procedure authorizing joinder of a private third party in district court, notwithstanding the fact that Kaiser (like SUWA) would be a co-defendant and not a plaintiff, and notwithstanding that Kaiser would present no new claims for coercive relief against the United States, the Court held that the district court lacked jurisdiction to extend the Tucker Act suit to parties or claims other than those expressly authorized. Id.[3]
The majority cannot cite any case in which the Supreme Court or this Court has interpreted a waiver of sovereign immunity to permit the addition of parties other than those identified in the waiver statute.[4] The majority’s argument is precluded by Sherwood and Henderson, which treat the matter of “who may sue” and who may be joined in an existing suit as no less “substantive,” 517 U.S. at 671, 116 S.Ct. 1638, and “jurisdiction[al],” 312 U.S. at 591, 61 S.Ct. 767, than the matter of “what claims” may be brought.[5] I believe these decisions make clear that Rule 24 does not and cannot be used to expand the parties to a Quiet Title Act suit beyond its terms.
*1215 Let us turn, then, to the Quiet Title Act. Under Supreme Court precedent, the proper approach toward determining the extent of sovereign immunity waived and retained is to engage in a strict construction of the terms of statutory waiver, with attention to traditional limits on suits against the sovereign. See Shaw, 478 U.S. at 319-20, 106 S.Ct. 2957 (“[Statutes placing the United States in the same position as a private party ... have been read narrowly to preserve certain immunities that the United States has enjoyed historically.”); Lehman v. Nakshian, 453 U.S. 156, 160-62, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981).
The Quiet Title Act allows the United States to “be named as a party defendant in a civil action ... to adjudicate a disputed title to real property in which the United States claims an interest.” 28 U.S.C. § 2409a(a). The Act requires that a plaintiffs “complaint ... set forth with particularity the nature of the right, title, or interest which the plaintiff claims in the real property, the circumstances under which it was acquired, and the right, title, or interest claimed by the United States.” Id. § 2409a(d). If the final determination is adverse to the United States, the government may elect either to cede possession and control of the disputed property or to pay just compensation. Id. § 2409a(b). The Act also contains a specific statute of limitations. Id. § 2409a(g). The Quiet Title Act thus specifies who may sue, what claims may be made, what relief may be afforded, and what limitations period applies. These are precisely the matters the Supreme Court deems “substantive” and not “auxiliary.” Henderson, 517 U.S. at 671, 116 S.Ct. 1638. They are, therefore, governed by the terms of the waiver statute, strictly construed, rather than by the Rules of Civil Procedure. See, e.g., United States v. Beggerly, 524 U.S. 38, 48-49, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998) (strictly interpreting the statute of limitations in the Quiet Title Act).
The Quiet Title Act is carefully limited to the adjudication of disputes among parties with competing claims to title to resolve the question of ownership. This Court has said time and again that other “interests” in government property do not suffice. See Sw. Four Wheel Drive Ass’n v. Bureau of Land Mgmt., 363 F.3d 1069, 1071 (10th Cir.2004) (“Members of the public ... do not have a ‘title’ in public roads, and therefore cannot meet the requirements of section 2409a(d).”); Kansas v. United States, 249 F.3d 1213, 1225 (10th Cir.2001) (“The ‘interest’ which the State seeks to protect in this case is not an interest in the title to real property contemplated by the QTA.”); Kinscherff v. United States, 586 F.2d 159, 160-61 (10th Cir.1978) (holding that a plaintiff asserting a right as a member of the public to use a road could not bring a Quiet Title Act suit because he had no title interest).[6]
Allowing parties like SUWA or ATV-user groups — that is, parties without a claim to title — -to intervene in a Quiet Title Act suit would introduce into the litigation parties not contemplated by the Act, thereby forcing the United States to engage in litigation it has not consented to. There is no reason to think Congress intended Quiet Title Act cases to become forums for consideration of broad-ranging arguments about competing environmental and recreational uses of the land, offered by public-interest groups that are strangers to the *1216 underlying title dispute. See Block v. North Dakota, 461 U.S. 273, 280, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983) (noting that Congress passed the Quiet Title Act to augment the “limited means” parties “asserting title to land claimed by the United States” had in “obtaining a resolution of the title dispute ”) (emphasis added).
The limited scope of the Quiet Title Act is consistent with longstanding congressional policy, expressed in a wide variety of statutes addressing disputes between the United States and private parties over the ownership of property. In every such statutory context of which I am aware, Congress has limited litigation to parties who have a claim to the property in question, relegating to the status of amici curiae those parties who — like SUWA- — oppose the interests of other private claimants but do not themselves claim the property.
In High Country Citizens Alliance v. Clarke, 454 F.3d 1177 (10th Cir.2006), this Court engaged in a comprehensive review of statutory schemes for resolution of disputes over claims to patents and other ownership interests in federal land and mining claims, dating back to 1866. Id. at 1182-86. The Court found that cases involving mining claims “uniformly preclude persons ... not claiming a property interest in the land, from judicially contesting the validity of the patent.” Id. at 1186; see also id. at 1188 (similar conclusion with respect to land patents). This Court concluded: “Permitting a challenge by third parties with no interest in the land would allow the kind of lengthy litigation over rights that a patent was designed to avoid.” Id. at 1185. As the Supreme Court commented as far back as 1881, “[i]t does not lie in the mouth of a stranger to the title to complain of the act of the government with respect to it.” Smelting Co. v. Kemp, 104 U.S. 636, 647, 26 L.Ed. 875 (1881).
In these analogous contexts, entities similar to SUWA — that is,-entities without any ownership claim — sometimes were accorded the right to file protests against the claims of other private parties at the administrative level, but in court they were given only the standing of amicus curiae. High Country, 454 F.3d at 1187 (citing Wight v. Dubois, 21 F. 693, 693-94, 696 (C.C.D.Colo.1884); Beals v. Cone, 188 U.S. 184, 187, 23 S.Ct. 275, 47 L.Ed. 435 (1903)). In light of the Quiet Title Act’s careful specification of parties and claims and its other requirements designed to limit litigation over title disputes, it is highly unlikely that Congress implicitly departed from this traditional model of litigation when it consented to be sued by persons claiming title to real property. See Lehman, 453 U.S. at 162, 101 S.Ct. 2698 (“The appropriate inquiry, therefore, is whether Congress clearly and unequivocally departed from its usual practice in this area ....”); cf. Block, 461 U.S. at 284, 103 S.Ct. 1811 (noting that one of the concerns prompting the inclusion of a statute of limitations and a limited retroactivity provision in the Quiet Title Act was the government’s fear of “ ‘a flood of litigation ... putting an undue burden on the Department [of Justice] and the courts’ ”) (quoting H.R.Rep. No. 92-1559, at 7 (1972), U.S.Code Cong. & Admin.News 1972, pp. 4547, 4553-54 (letter from the Deputy Attorney General)).
The majority disparages these cases as “century-old”-a strange complaint given High Country’s recent vintage and the importance of traditional limitations as a guide to interpreting sovereign immunity waivers. It cites two cases to suggest that intervention by parties without an interest in title is commonplace, at least “in this part of the country.” Maj. Op. 1185. Upon closer examination, those cases do little to undermine the traditional limita *1217 tion of lawsuits over federal land claims to parties with claims to title.
The majority first cites Watt v. Western Nuclear, Inc., 462 U.S. 36, 103 S.Ct. 2218, 76 L.Ed.2d 400 (1983), which was a challenge, brought under the Administrative Procedures Act, to the Department of Interior Board of Land Appeals’ ruling that gravel constituted “ ‘a mineral reserved to the United States in patents issued under the Stock-Raising Homestead Act.’ ” Id. at 41, 103 S.Ct. 2218 (quoting 85 Interior Dec. 129, 139 (1978)). The plaintiff also sought to quiet title to the gravel. As this Circuit explained in our opinion in the case:
In the trial court, the Wyoming Stock Growers Association, John Orr, and the Associated General Contractors of Wyoming were permitted to intervene as parties plaintiff. The basis for such intervention was that they too had an interest in lands patented under the Stock-Raising Homestead Act of 1916 and subject to the same mineral reservation as Western Nuclear.
W. Nuclear v. Andrus, 664 F.2d 234, 236 n. 4 (10th Cir.1981). In other words, the intervenors were allowed into the case because the agency’s interpretation of what constituted “minerals” under the Stock-Raising Homestead Act might control ownership of gravel on their own lands; they apparently sought to quiet title to ownership of the gravel on their property. In any event, because the district court made no rulings with respect to their claims, the intervenors did not appeal and neither this Court nor the Supreme Court had occasion to pass on whether their intervention was proper. In both this Court and the Supreme Court, the former intervenors participated solely as amici curiae, as the cases cited in High Country suggest is proper for parties whose own claim to title is not at issue.
In the second case relied on by the majority, Pathfinder Mines Corp. v. Hodel, 811 F.2d 1288 (9th Cir.1987), the Department of Interior Board of Land Appeals determined that the statute creating the Grand Canyon National Game Preserve “withdrew Preserve lands from entry because mineral entry was inconsistent with the purposes of the Game Preserve.” Id. at 1290. The Board thus declared void ab initio several of Pathfinder’s mining claims, which were brought under the General Mining Law of 1872. Id. Two environmental organizations intervened in support of the Board’s interpretation, and the Ninth Circuit merely noted this posture in its opinion. Id. The court did not address the propriety of the intervention, and made no mention of any claims or arguments raised by the intervenors. See Pennhurst, 465 U.S. at 119, 104 S.Ct. 900 (warning against ascribing precedential significance “when questions of jurisdiction have been passed on in prior decisions sub silentio” (internal quotation marks omitted)).
I therefore conclude that the question of “who can sue” and who can join a preexisting lawsuit of this sort is answered by the Quiet Title Act itself. Whether “strictly construed” in favor of the sovereign (as it must be) or interpreted in light of traditional limitations on litigation over federal land claims, the Act does not contemplate the participation of parties, like SUWA, who have no claim to the disputed land. Rule 24(a) allows intervention by “anyone” who claims an interest “relating to” the property, while the Quiet Title Act limits suits to parties who claim a “right, title, of interest ... in the real property,” 28 U.S.C. § 2409a(d). Even assuming SUWA’s interests are sufficient to qualify under the Rule, they fall short under the statute. And it is the statute, not the Rule, that determines the scope of Con *1218 gress’s waiver of sovereign immunity. See Fed.R.Civ.P. 82 (“These rules shall not ... extend ... the jurisdiction of the United States district courts.... ”).
III. THE MAJORITY’S SOVEREIGN IMMUNITY ARGUMENTS ARE UNPERSUASIVE
The majority offers three lines of argument in support of its claim that sovereign immunity would not bar intervention by a party that does not meet the criteria set forth in the Quiet Title Act: (1) that permitting intervention would not expose the government to litigation burdens beyond those necessarily contemplated by the Quiet Title Act, Maj. Op. 1173-74; (2) that the identity of intervening parties is a mere “condition” on the waiver of sovereign immunity, which must be affirmatively reserved by Congress, id. at 1175; and (3) that sovereign immunity does not bar the addition of parties nominally aligned as codefendants with the government, even if their interests and legal positions diverge, id. at 1182-83. The majority does not explain how these seemingly inconsistent arguments fit together. In any event, none of them comports with Supreme Court precedent. Perhaps the Supreme Court some day will adopt one of these positions, and I make no claim that fundamental principles of constitutional structure would be offended if it did so. As of now, however, the Supreme Court has not constricted sovereign immunity in the fashion envisioned by the majority.
A. SUWA’s Intervention Would Affect the Government’s Substantive Rights
The majority responds first by stressing the “limited nature of what is at stake.” Maj. Op. 1173. According to the majority, the government is wrong to invoke the protections of sovereign immunity in this case because the intervention of SUWA “would not expose the United States to any burden not inherent in the litigation to which it has consented in the Quiet Title Act.” Id. at 1174. I cannot agree.
This Court has held that “[i]f a party has the right to intervene under Rule 24(a)(2), the intervenor becomes no less a party than others.” Coalition of Arizona/New Mexico Counties for Stable Econ. Growth v. Dep’t of Interior, 100 F.3d 837, 844 (10th Cir.1996). Party status entails the rights to seek and enforce coercive judicial remedies — to raise new issues, oppose settlement, appeal, and file petitions for certiorari. The majority addresses each of these party prerogatives and attempts to show either that SUWA would not have the right to exercise them or that doing so would be inconsequential to the government. On each of these points, the majority gravely underestimates the significance of according party status to an organization whose interests diverge from the government’s.
New issues. The majority does not deny the right of a party to raise new issues, but dismisses this prerogative as inconsequential on the ground that “the court trying the case (even in the absence of any intervenor) can require the government to address a legal theory not raised by the original parties.” Maj. Op. 1174 (citing Dickerson v. United States, 530 U.S. 428, 441 n. 7, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000)). This is not persuasive.
There must be hundreds of cases in this Circuit holding that the court has no obligation to, and ordinarily should not, address issues not raised by the parties. See, e.g., Tyler v. City of Manhattan, 118 F.3d 1400, 1404 (10th Cir.1997) (“Our review of the relevant case law demonstrates that it is truly the exceptional case when an appellate court will reach out to decide *1219 issues advanced not by the parties but instead by amicus.”); Pittsburg & Midway Coal Mining Co. v. Yazzie, 909 F.2d 1387, 1422 (10th Cir.1990) (declining to address an issue waived by the parties despite its being raised by the amici); Warner v. Aetna Health Inc., 333 F.Supp.2d 1149, 1154 (W.D.Okla.2004) (“Because the parties do not raise any issue of whether the rehabilitation program ... was appropriately tailored ..., the Court does not address the reasonableness of the rehabilitation plan itself.”); Cotracom Commodity Trading Co. v. Seaboard Corp., 189 F.R.D. 655, 666 (D.Kan.1999) (“Where the parties fail to raise the issue of choice of law, the Court need not raise the issue sua sponte ....”); United States v. Rith, 954 F.Supp. 1511, 1517 n. 2 (D.Utah 1997) (“Because the government did not raise this argument in its suppression motion, this court reluctantly declines to do so as well.”); Masek Distributing, Inc. v. First State Bank & Trust Co., 908 F.Supp. 856, 861 (D.Kan.1995) (“The parties do not raise and the court does not address whether or not the facsimile at issue has an authorized authentication.”). Even though, in unusual cases like Dickerson, courts sometimes exercise their discretion to entertain arguments not made by the parties, the difference between a party and a non-party remains significant: a party has the right to raise new issues. This means that the addition of a co-defendant with divergent legal views will force the government to litigáte issues that it prefers not to address -and that have not been raised by any party to whose participation Congress has consented.
Appeal and certiorari. The majority states that “there is no need to resolve at this stage of this case whether SUWA could appeal or seek certiorari when the government does not wish to.” Maj. Op. 1173. That can be so only if these litigation possibilities do not matter. But surely they do. It is not uncommon for the government to decline to appeal or petition for certiorari when it loses a case, sometimes because, in the Solicitor General’s professional judgment, the particular case is an unpropitious vehicle for vindicating the government’s views. Yet it is also not uncommon for intervenor-defen-dants to disagree with the Solicitor General’s judgment. See, e.g., Pet. for Writ of Cert. at 10, Mitchell v. Helms, 530 U.S. 793, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000) (petition for certiorari filed by a private intervenor-defendant where the Court of Appeals held a federal statute unconstitutional and the United States declined to petition). Indeed, experienced practitioners regard the ability to appeal or petition as one of the principal reasons to intervene in support of the government in public interest litigation. From the government’s point of view, however, the ability of a nominal co-party to appeal or petition deprives the Department of Justice of a valuable tool of strategic litigation management.
It thus appears that the majority’s reservation of this issue is merely a convenient way of disguising or ignoring the full implications of allowing SUWA into this suit. Once SUWA is granted party status at the trial level — in other words, once we hold that the Quiet Title Act permits such participation — it would make little sense to hold that the Act precludes such a party’s participation at the appellate level. Nothing in the Act supports such a bifurcation. At either level, SUWA’s arguments will be the same, will be contrary to the government’s position, and will offend sovereign immunity. The majority responds that such a reading of the Quiet Title Act “make[s] perfect sense” because the doctrine of standing might block an intervenor from pursuing an appeal. Maj. Op. 1173. But standing is a jurisdictional question *1220 separate and apart from sovereign immunity; the issue here is what sovereign immunity permits, not what the law of standing might preclude.
Settlement. The possibility that an inter-venor might oppose a settlement negotiated by the claimants to title is particularly significant. The majority dismisses the importance of this prerogative on the ground that intervenors cannot “block a settlement.” Maj. Op. 1173. To be sure, the Supreme Court has held that interve-nors do not have the power of absolute veto over settlements. See Local No. 93 v. City of Cleveland, 478 U.S. 501, 528-30, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986). But, in the same breath, the Court also held that “an intervenor is entitled to present evidence and have its objections heard at the hearings on whether to approve a consent decree.” Id. at 529, 106 S.Ct. 3063. Thus, in City of Cleveland itself, “Local 93 took full advantage of its opportunity to participate in the District Court’s hearings on the consent decree. It was permitted to air its objections to the reasonableness of the decree and to introduce relevant evidence.... ” Id. Consequently, while a non-title intervenor in a Quiet Title Act case would not hold an absolute veto over settlement, it might well take advantage of litigation prerogatives not open to an amicus — such as evidentiary hearings and the power to enforce rulings in its favor. In other words, the United States would have to litigate against the interve-nor in defense of its settlement with the parties that actually have a claim to title— a form of litigation not contemplated by the Quiet Title Act’s limited waiver of sovereign immunity.
Identity of legal positions. The majority’s only remaining argument must be that SUWA’s intervention would not impose improper litigation burdens on the United States because its interests and legal positions coincide with those of the government. See Maj. Op. 1182-83, 1203-07. If there is no divergence of interests, the intervenor would raise no new issues, would not appeal or seek certiorari unless the government did also, and would not oppose any settlement in which the government joined. But this raises the interesting question: Does the majority’s sovereign immunity analysis apply only when the intervenor’s interests are adequately represented by the government, and thus only when the intervention fails the test of Rule 24(a)? Is the majority defending a null set?
This argument raises an even more puzzling question for the three dissenting judges who join this part of the majority’s opinion and are necessary to its majority status. Unlike the majority, the dissenters argue that “SUWA’s objectives are not identical to those of the United States,” Ebel, J., dissenting, at 1227, and “the potential and even likelihood of a conflict between the positions of the United States and SUWA cannot be avoided,” id. at 1229. If this is correct, then SUWA’s participation as a party will indeed “expose the United States to [ ] burden[s] not inherent in the litigation to which it has consented.” Maj. Op. 1174. Either the dissenters are wrong to join the majority on this point, or the majority’s assurances regarding the “limited nature of what is at stake” are hollow. Maj. Op. 1173. Suppose the dissenters are right about SUWA’s interests and likely legal positions. Would the majority then agree that sovereign immunity is violated?
B. The Majority’s Affirmative Theory of Sovereign Immunity Is Inconsistent with Supreme Court Precedent
Let us turn now to the majority’s affirmative theory. According to the majority, *1221 it is necessary to “distinguish two concepts: (1) sovereign immunity and (2) a condition on a waiver of sovereign immunity.” Maj. Op. 1174. “Sovereign immunity,” according to the majority, refers to the government’s immunity from “the imposition of a coercive sanction” without its express consent. Id. at 1175. In other words, in the absence of consent, “a court cannot make a government pay its debts or compensate for its torts, or impose other coercive remedies on the government.” Id. On the other hand, so goes the majority’s theory, “[wjhen the government consents to be sued, it can impose conditions on that consent,” such as to “require notice of suit, set a statute of limitations, forbid discovery ..., or even forbid joinder of parties.” Id. at 1175. The obligation to “impose conditions” appears to be affirmative; that is, according to the majority, “conditions” on the waiver of sovereign immunity must be expressly articulated by the Congress, see id. 1183-84. In other words, the government is subject to all generally applicable burdens of litigation, such as those imposed by the Rules of Civil Procedure, unless the waiver has been conditioned on their inapplicability. See id. at 1186 (“[Ojnce a federal district court has jurisdiction of a case under the Quiet Title Act, the usual rules of procedure ... ordinarily apply.”). Moreover, according to the majority, the Supreme Court has abandoned the rule of strict construction of waivers of sovereign immunity and is now likely to construe conditions on the government’s consent the same as it would construe similar conditions imposed on private litigation. Id. at 1185-86. Because the Quiet Title Act does not explicitly mention Rule 24 intervention, one way or the other, the majority concludes that sovereign immunity does not bar intervention (even by a party outside the scope of the express terms of the waiver) unless the intervenor is raising an independent claim for monetary compensation or other coercive sanctions against the government. Id. at 1187-88.
This conception of sovereign immunity is the majority’s own construct. No opinion of the Supreme Court has ever suggested that what the majority views as the waiver of the essential core of sovereign immunity — susceptibility to coercive sanctions— must be express, but that the government is otherwise subject to all generally applicable burdens of litigation unless Congress explicitly reserves its immunity. On the contrary, the Court has unequivocally stated that the identity of parties to litigation against the government — “who can sue” and what parties may join existing lawsuits — is substantive and jurisdictional, and is governed by the “strict construction” rule of the sovereign immunity precedents. Henderson, 517 U.S. at 671, 116 S.Ct. 1638; Sherwood, 312 U.S. at 591, 61 S.Ct. 767. See pages 1213-15 above. Nor has the Supreme Court abandoned the rule of strict construction of waivers of sovereign immunity “[i]n recent years,” as the majority provocatively asserts. Maj. Op. 1185. For recent cases to the contrary see, for example, Orff v. United States, 545 U.S. 596, 601-02, 125 S.Ct. 2606, 162 L.Ed.2d 544 (2005); Dept. of the Army v. Blue Fox, Inc., 525 U.S. 255, 261, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999); Lane, 518 U.S. at 192, 116 S.Ct. 2092.
The majority extracts its theory from two Supreme Court decisions interpreting statutes of limitations in immunity waiver statutes. See Maj. Op. 1185-86 (citing Irwin v. Dept. of Veterans Affairs, 498 U.S. 89, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990); Scarborough v. Principi, 541 U.S. 401, 124 S.Ct. 1856, 158 L.Ed.2d 674 (2004)). In both cases, the Court interpreted the statutes of limitation contained within immunity waivers as allowing generally-applicable exceptions to strict compliance with the *1222 limitations period. See Irwin, 498 U.S. at 95-96, 111 S.Ct. 453; Scarborough, 541 U.S. at 413, 418-19, 124 S.Ct. 1856. In two unanimous decisions after Irwin, however — given only passing reference by the majority — the Court distinguished Irwin and rejected claims for generally-applicable exceptions to statutes of limitations on the ground that “Congress did not intend courts to read other unmentioned, open-ended, ‘equitable’ exceptions into the statute that it wrote.” United States v. Brockamp, 519 U.S. 347, 352, 117 S.Ct. 849, 136 L.Ed.2d 818 (1997); see also United States v. Beggerly, 524 U.S. 38, 48, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998) (strictly interpreting the statute of limitations in the Quiet Title Act). Thus, Irwin and Scarborough do not even establish a general rule for interpreting statutes of limitations, let alone for application of all rules of procedure not expressly disavowed. Indeed, contrary to the majority, in Irwin the Court stated: “Respondents correctly observe that [the statute of limitations] is a condition to the waiver of sovereign immunity and thus must be strictly construed." 498 U.S. at 94, 111 S.Ct. 453 (emphasis added) (citing Shaw, 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250).
According to the Court’s opinion in Irwin, the decision reflected nothing more than a “realistic assessment of legislative intent” — namely, that when Congress set a statute of limitations it most likely understood it to be interpreted the same way most statutes of limitations are interpreted. Id. at 95-96, 111 S.Ct. 453. Scarborough was essentially the same. See 541 U.S. at 421, 124 S.Ct. 1856.[7] The majority’s argument in this case, by contrast, does not purport to be based on the likely meaning or legislative intent of the words of the Quiet Title Act, but rather on application of a rule expressed outside of the Act — namely, Rule 24 — to Quiet Title Act proceedings. That is quite a different matter, as the majority appears to recognize elsewhere in its opinion. See Maj. Op. 1182 (acknowledging that “[u]nder settled law,” 28 U.S.C. § 1367(a), which “is expressed in general terms, applying to all litigants,” but which contains “no mention of sovereign immunity,” “does not waive federal sovereign immunity”).
Even if the majority’s general theory were adopted, however, it does not follow that the identity of parties or issues could be classified as a “nonessential” aspect of sovereign immunity — a mere “condition” on the waiver. The question of who can litigate and what claims can be brought is the core of subject matter jurisdiction, and is specified (in terms general or specific) in every statute waiving sovereign immunity.[8] *1223 It is more logical to think of questions about the identity of parties and issues as involving the “scope” of the waiver than as involving “conditions” on the waiver, analogous to the statutes of limitations in Irwin and Scarborough. Irwin and Scarborough involved statutes that waived sovereign immunity for certain defined lawsuits — that is, suits involving defined parties and defined claims — and, in separate sections, imposed time frames for filing. See Scarborough, 541 U.S. at 406-408, 124 S.Ct. 1856; Irwin, 498 U.S. at 91-93, 111 S.Ct. 453. It was therefore logical for the Supreme Court to read compliance with those time frames as “conditions” on the waiver of immunity. The question of who may participate as a party in a Quiet Title Act case, however, is of a different order. The Act does not “condition” its waiver of sovereign immunity on the nonintervention of entities without claim to title. (There is no suggestion, for example, that if an entity without claim to title were a necessary party, the court would lose jurisdiction over the case.) Rather, the Act defines the interests an entity must possess in order to be a party. Properly understood, this case has nothing to do with “conditions”; it has to do with the scope of the immunity waiver — “who may sue” and who may join. See Henderson, 517 U.S. at 671 & n. 21, 116 S.Ct. 1638 (citing Sherwood, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058). Not even the majority can suggest that the scope of an immunity waiver must be broadly construed, or that restrictions on the scope of a waiver must be affirmatively articulated.
C. There Is No Exception to Sovereign Immunity In Cases Where a Party Seeks to Intervene As Co-Defendant
Finally, the majority endorses Judge Ebel’s argument that sovereign immunity does not preclude intervention by parties who “seek[ ] only to intervene on the United States’ behalf.” Ebel, J., dissenting, at 1208 n. 2; see Maj. Op. 1183 (“[I]t makes no sense to say that sovereign immunity is infringed by participation on the side of the sovereign’s claim or defense.”).[9]
*1224 I do not see how the majority can square an endorsement of a distinction between intervenor-plaintiffs and interve-nor-defendants with its general theory of sovereign immunity waivers. If admitted as an intervenor, an ATV-users group would raise no new claim against the United States for damages or other coercive sanctions, but would simply advance claims already asserted by San Juan County and the State. Under the majority’s theory of sovereign immunity, therefore, participation by such a group raises only the question of “conditions” on the waiver. Because the Quiet Title Act is silent on the question of intervention by intervenor-plaintiffs, just as it is silent on intervention by intervenor-defendants, the majority’s theory suggests that sovereign immunity poses no bar to intervention by ATV users. The fact that the majority embraces Judge Ebel’s position suggests that its overarching theory must be lacking in some respect.
Even on its own terms, the argument that sovereign immunity necessarily allows intervention by entities that seek only to intervene on the United States’ behalf is unwarranted.
Let us begin with precedent. Neither the majority nor Judge Ebel successfully squares this position with Sherwood, which rejected joinder of a codefendant (and not just a co-plaintiff) under the Tucker Act. See 312 U.S. at 589, 61 S.Ct. 767. Unless we accept the majority’s untenable view that Sherwood speaks only to the joinder of claims, see note 5 above, or has been limited by treatises, Maj. Op. at 1177-78, this is a decisive objection.
The majority does cite Trbovich v. United Mine Workers of America, 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972), drawing significance from the fact that, in the case, “[n]o one thought to suggest ... that there is a sovereign interest that would be violated by allowing a union member to intervene on the side of the Secretary of Labor in challenging a union election.” Maj. Op. 1183. But no one thought to advance this argument because sovereign immunity does not apply in cases, like Trbovich, where the government is the plaintiff.[10] Trbovich is, therefore, irrelevant.
With no authority in the Supreme Court or this Court to support its position, the majority quotes and adopts the holding of a moth-eaten decision from the Second Circuit, International Mortgage & Investment Corp. v. Von Clemm, 301 F.2d 857 (2d Cir.1962). That opinion, however, illustrates precisely the danger of the idea that there is no sovereign immunity bar to the intervention of anyone who is nominally aligned with the government. The case involved competing claims to property originally owned by International Mortgage and Investment Corporation (“IMC”), which had been seized by the federal Office of Alien Property after Nazi Germany appropriated stock in the corporation from its Jewish owners. Id. at 859. The plaintiffs were private persons and *1225 entities, American citizens, who asserted claims to the property and sued the United States in federal court. Id. The potential intervenors were non-enemy stockholders in IMC who sought to defend the corporation’s interests by opposing the claims of the plaintiffs. Id. at 859-60. Because they missed a notice of claim filing deadline, they were barred from instituting a suit directly against the United States. Id. at 860. In district court, they sought to intervene both as plaintiffs and as defendants, but on appeal characterized their claim as being that of party defendants, apparently on the ground that their interests were adverse to the party plaintiffs. Id. The Second Circuit permitted intervention as of right, rejecting the sovereign immunity objection on the ground that the consent of the United States is not necessary “to the intervention as a party defendant of one otherwise qualified to intervene for the purpose of asserting various defenses on behalf of the United States.” Id. at 868.
The result in Von Clemm is perverse. Intervention served as an end-run around the clear terms of the waiver of sovereign immunity. Although the United States consented to be sued only when claimants to property filed an action within a particular time, the Von Clemm intervenors, who failed to do so, were permitted to litigate. Moreover, although the Second Circuit justified intervention (as the majority and Judge Ebel do here) on the ground that the intervenors were aligned with the government, in fact their interests greatly diverged. As the court described it: the governmental parties had “shown a conspicuous disinterest in asserting the rights of IMC to the vested property” and there was “no reason ... to suppose that the Department of Justice ... will exhibit ... enthusiasm for pressing appellants’ claims in the court.” Id. at 861. Nonetheless, because IMC’s claims were technically “defenses on behalf of the United States” against the plaintiffs, id. at 868, and the Second Circuit could “see no reason why the defense of the action should be wholly within the control of officers of the government,” id. at 864, the court allowed the IMC stockholders to intervene. The result was that the government was forced to take positions on issues neither it nor the actual parties wished to litigate, and to contemplate results it had a “conspicuous disinterest” in achieving. In the court’s words, it lost “control” over the defense of the lawsuit, all because of the intervention of persons who had neglected to file suit in accordance with the terms of the waiver of sovereign immunity. I dissent from the majority’s embrace of this ruling.
Let us turn now to the logic of the matter. By limiting their argument to intervention by parties on the same side as the United States, Judge Ebel and the majority appear to concede that sovereign immunity would bar intervention by opposing parties, presumably because this would require the United States to expend resources in litigating against parties to whose participation it has not consented. But this distinction erroneously assumes that formal alignment of the intervenor as co-defendant eliminates the danger that it will take positions different from, or adverse to, those taken by the United States. This is the very assumption Judge Ebel challenges in the remainder of his opinion. As he says, “SUWA’s objectives are not identical to those of the United States,” Dissenting Op. 1227, and “the potential and even likelihood of a conflict between the positions of the United States and SUWA cannot be avoided,” id. at 1229.
SUWA seeks to intervene so that it can advance arguments and strategies that the government, for a variety of reasons, opposes or prefers to avoid. After all, SUWA must have a reason to want to *1226 intervene, and the United States and the County — aligned on this issue — must have a reason to prefer to keep SUWA out. In SUWA’s own words, it “may press a different interpretation of Utah law concerning the creation of rights-of-way, may argue that San Juan has a tougher burden of proof than Interior is willing to press, may more vigorously seek out additional witnesses, or more aggressively confront the County’s witnesses.” Appellant’s Supp. Br. on Reh’g En Banc 22 n. 11. As SUWA explains the difference between its interests and those of the government:
[T]he government must balance the nation’s varying interests when deciding what defenses to raise, what arguments to make, how vigorously to make them, and whether to defend itself at all. In doing so, the federal government may weigh factors that carry little or no weight with individuals, groups, or local and state governments....
Id. at 20-21. In a given suit, the government may opt for a particular litigation strategy that best suits its overall interests — including political and policy objectives, possibly including smoothing relations with state and local governments— but that fails to maximize its chances of winning that particular suit or of setting the most favorable precedent for other R.S. 2477 suits.
As already discussed, the possibility that an intervenor might oppose a settlement negotiated by the claimants to title is particularly significant. For example, in the litigation culminating in S. Utah Wilderness Alliance v. Bureau of Land Mgmt., 425 F.3d 735, 742-43 (10th Cir.2005), SUWA initially sued BLM; BLM then sued the Utah counties and aligned itself with SUWA. On remand after this Court’s decision, BLM negotiated a settlement with the counties. At that point, the party alignments shifted a second time, and SUWA opposed the settlement, which was then approved over SUWA’s opposition. See S. Utah Wilderness Alliance v. Bureau of Land Mgmt., No. 2:96-cv-00836, Memorandum in Support of Motion to File Third Amended Complaint, Docket No. 461, at 4-5 (D.Utah May 3, 2006). One would expect precisely the same type of maneuvering if ATV user groups intervened in support of the counties and the counties settled for less than the ATV users desired. Either way, the parties with claims to title — namely, the United States, the counties, and the State — would be forced to litigate against an entity that is a “stranger to the title.” Smelting Co., 104 U.S. at 647. And if that is impermissible in the context of intervenor-plaintiffs, I should think it equally impermissible in the context of intervenor-defendants.
For all these reasons, if SUWA is allowed to intervene in this QTA suit, even as a co-defendant, there is a significant “potential and even likelihood” that it will file motions in opposition to the litigation strategies and legal positions pursued by the government. The government, in turn, would be forced to oppose its formerly friendly intervenor and would thereby be subjected to litigation beyond the scope of the Quiet Title Act — namely, battling a party that has no claim to title in the land at issue. Congress has consented to no such thing.

. As explained below, I conclude that the motion for intervention should be dismissed on jurisdictional grounds. However, because the Court reaches the merits of the motion to intervene, I do so as well. See Initiative & Referendum Inst. v. Walker, 450 F.3d 1082, 1105 n. 1 (10th Cir.2006) (en banc) (Tacha, C J., dissenting on jurisdictional grounds but concurring on the merits). Because SUWA lacks the legal interest necessary to intervene, there is no need to decide whether any interests it may have are adequately represented by the United States.

. The provision is now found at Fed.R.Civ.P. 4(m).

. There is no need to respond to the majority’s labored attempts to distinguish Sherwood, because the grounds of distinction do not touch the only point for which I rely on it— that sovereign immunity precludes the joinder of parties outside the scope of the statutory waiver in cases against the United States, even where such joinder would be authorized by the rules of civil procedure in private litigation.

. The best the majority can offer is a complicated, multi-page argument along the following lines: (1) Finley v. United States, 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), which makes no reference to sovereign immunity, could have contained an alternative holding based on sovereign immunity; (2) Congress enacted 28 U.S.C. § 1367(a), which reversed the actual holding of Finley; (3) the Supreme Court, in Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 558, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005), subsequently referred to that statute as reversing the “result” (and not just the holding) of Finley, and (4) therefore, Finley's hypothetical alternative holding based on sovereign immunity has also, impliedly, been rejected by the Court. See Maj. Op. 1180-83. That is an extraordinarily slender reed. See Pennhurst, 465 U.S. at 119, 104 S.Ct. 900 (warning against ascribing precedential significance "when questions of jurisdiction have been passed on in prior decisions sub silentio " (internal quotation marks omitted)).

. At one point, the majority suggests that Sherwood is really about the joinder of claims. Maj. Op. 1179. That is not a tenable reading of the decision. The sole issue in Sherwood was joinder of necessary parties, 312 U.S. at 588, 61 S.Ct. 767. It had nothing to do with the joinder of new claims between existing parties. Indeed, the Supreme Court itself described Sherwood as a case about "who may sue” in contradistinction to a case about "what claims” may be made. Henderson, 517 U.S. at 671 & nn. 21-22, 116 S.Ct. 1638.

. That, as the majority notes, the Quiet Title Act permits other parties claiming title to the disputed land to be joined as co-defendants (presumably only if they satisfy the statute of limitation and other prerequisites to bringing a claim specified in the Act), Maj. Op. 1172-73, 1183-84, is no reason to allow intervention by parties without any such claim.

. One distinguished commentator finds the results in Irwin and Scarborough difficult to reconcile with the Court's strict construction of the scope of sovereign immunity waivers in Shaw and other cases. Gregory C. Sisk, Litigation With the Federal Government § 2.03, at 97 (4th ed.2006). Contrary to the majority, he concludes that "the Shaw strict construction approach appears to predominate,” while observing that “unless and until Irwin has been either discarded by the Court as an anomalous opinion or placed by the Court into a separate procedural category,” it will produce what he calls "continuing tension.” Id. This case appears to be an example.

. See, e.g., 5 U.S.C. § 702 ("A person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.”); 28 U.S.C. § 1498(a) (authorizing the "owner” of a patent to bring an "action against the United States in the ... Court of Federal Claims” if the invention "described in and covered by” the patent "is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same,” but specifying that “any patentee or any assignee of such patentee” has no right to sue "with respect to any invention discov *1223 ered or invented by a person while in the employment or service of the Untied States, where the invention was related to the official functions of the employee”); 28 U.S.C. § 2674 (specifying that the "United States shall be liable ... to tort claimsf ] in the same manner and to the same extent as a private individual under like circumstances”); 33 U.S.C. §§ 1365(a), (g) (authorizing "any citizen” to “commence a civil suit on his own behalf” against the United States alleging that the government has violated air quality standards set out in the Clean Water Act, and specifying that a "citizen” is a "a person or persons having an interest which is or may be adversely affected”); 42 U.S.C. § 405(g) (providing that "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party ... may obtain a review of such decision by a civil action”); 42 U.S.C. §§ 2000e-16(a), (c) (specifying that "[a]ll personnel actions affecting employees or applicants for employment” in most areas of the federal government "shall be made free from any discrimination based on race, color, religion, sex, or national origin,” and declaring that "an employee or applicant for employment, if aggrieved by the final disposition of his complaint [by the Equal Opportunity Employment Commission], or by the failure to take final action on his complaint, may file a civil action” against a federal department or agency); 42 U.S.C. § 2000bb-l(c) ("A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.”).

. The majority coyly states in a footnote that this is merely "an additional argument against the sovereign-immunity contention,” and that "[w]e are in no way implying that intervention on the side of the plaintiff in this *1224 case would be barred by sovereign immunity.” Maj. Op. 1183 n. 6. Of course, if it is not true that intervention on the side of the plaintiff would be barred, this would not even be an "additional argument.” In any event, it appears to be central to the position of the four dissenting judges, who form an essential part of the majority on the sovereign immunity issue.

. The majority finds it "anomalous” that different rules apply to suits brought by the United States as plaintiff, where sovereign immunity does not apply, than to suits brought against the United States. Maj. Op. 1188. Admittedly, this may be anomalous, but if so, it is an anomaly that runs throughout the realm of litigation against the government. There is no reason to think the Quiet Title Act is an exception.